**GLENCANNON HOMES
ASSOCIATION,
INC.**

v.

**NORTH STRABANE TOWNSHIP, Canon–McMillan School District, McDowell Estates, L.P. and Heartland Homes, Inc.**

Appeal of: Canon–McMillan
School District.

Glencannon Homes Association,
Inc., Appellant

v.

North Strabane Township, Canon–McMillan School District, McDowell Estates, L.P. and Heartland Homes, Inc.

Glencannon Homes Association, Inc.

v.

North Strabane Township, Canon–McMillan School District, and Heartland Homes, Inc.

Appeal of: North Strabane Township.

Commonwealth Court of Pennsylvania.

Argued Nov. 12, 2014.
Decided April 22, 2015.

Robert A. Arcovio, Pittsburgh, for appellant North Strabane Township.

Brett W. Farrar, Pittsburgh, for appellant Canon–McMillan School District.

Marcia L.T. DePaula, Canonsburg, for appellee Glencannon Homes Association, Inc.

BEFORE: DAN PELLEGRINI, President Judge, BERNARD L. McGINLEY, Judge, RENÉE COHN JUBELIRER, Judge, ROBERT SIMPSON, Judge, MARY HANNAH LEAVITT, Judge, P. KEVIN BROBSON, Judge, PATRICIA A. McCULLOUGH, Judge.

OPINION BY Judge PATRICIA A. McCULLOUGH.

North Strabane Township (Township) and Canon–McMillan School District (School District) appeal from the June 25, 2013 order of the Court of Common Pleas of Washington County (trial court), which denied their post-trial motions and molded

the jury's verdict to the amount of $500,000.00 against the District and $500,000.00 against the Township, for a total of $1,000,000.00, in accordance with section 8553(b) of the statute commonly known as the Political Subdivision Tort Claims Act (PSTCA).[1] Glencannon Homes Association, Inc. (the Association) has filed a cross-appeal arguing that the trial court erred in imposing this statutory cap on damages and in failing to grant equitable relief.[2]

## Facts/Procedural History

The Association's members are homeowners in the Glencannon residential development located in the Township. (Trial court op. at 1.) The Association maintains the Glencannon Pond Dam (Pond), a common area in the development consisting of a twenty-four-foot-high, 295–foot–long earthen embankment dam, which provides storm water retention and sedimentation control for the residential units above the Pond. (Trial court op. at 1.)

In 1996, the School District initiated plans for the development of a sports complex located immediately north of the Pond and McDowell Lane in the Township.

(Trial court op. at 2; Reproduced Record (R.R.) at 27a.) The School District leased the land from the Township. (R.R. at 96a, 114a, 119a–24a.) Pursuant to an agreement between the School District and the Township in 1997, the Township undertook improvements to McDowell Lane. (Trial court op. at 2.) Also in 1997, the Association became aware of excessive amounts of sediment accumulating in the Pond, as well as erosion. (Trial court op. at 1.) The Association had contracted for various services related to the Pond's maintenance since these problems were discovered, including having the Pond dredged in 2001. (Trial court op. at 1.) In 2009, the Association discovered that whenever it rained, water, sediment, and other debris flowed from the sports complex to McDowell Lane, and, ultimately, into the Pond. (Trial court op. at 2.)

On June 2, 2011, the Association filed a second amended complaint against the School District and the Township[3] asserting claims of negligence and violations of the Storm Water Management Act (SWMA), Act of October 4, 1978, P.L. 864, *as amended,* 32 P.S. §§ 680.1–680.17.[4] (Tri-

---

1. 42 Pa.C.S. § 8553(b). This section sets forth a limitation on the amount of damages recoverable from a local agency, providing as follows:

 *Amounts recoverable.*—Damages arising from the same cause of action or transaction or occurrence or series of causes of action or transactions or occurrences shall not exceed $500,000 in the aggregate.

2. By order dated April 28, 2014, these appeals were consolidated.

3. The second amended complaint also included similar allegations against McDowell Estates, L.P. (McDowell Estates) and Heartland Homes, Inc. (Heartland Homes). (R.R. at 201a–33a.) However, neither McDowell Estates nor Heartland Homes were held liable for the damage to the Pond.

4. The Association initiated this action by filing a praecipe to issue writ of summons on July 28, 2010. (R.R. at 20a–21a.) The Association filed its complaint against the School District, the Township, McDowell Estates, and Heartland Homes on August 26, 2010, alleging negligence, *de facto* taking, nuisance, and trespass. (R.R. at 22a–49a.) The Township filed preliminary objections. (R.R. at 50a–63a.) On September 20, 2010, the Association filed an amended complaint against the School District, the Township, McDowell Estates, and Heartland Homes, alleging negligence, violations of the SWMA, nuisance, and trespass. (R.R. at 64a–93a.) The School District and the Township filed preliminary objections, to which the Association filed an answer. (94a–131a.) By order dated May 3, 2011, the trial court denied the Township's preliminary objections. (R.R. at 199a–200a.) By order dated May 19, 2011, the trial court

al court op at 2; R.R. at 201a–33a.) The School District filed preliminary objections, and the Association filed an answer. (R.R. at 265a–84a, 294a–98a.) The trial court denied the School District's preliminary objections and a trial commenced on June 11, 2013. (R.R. at 335a.)

Robert Snow, a senior principal engineer for D'Appolonia Engineers, the firm contracted by the Association in 1997 to provide a plan to improve the Pond's sediment problem, testified that the firm only provided services to improve the Pond and was never asked to determine the cause of the increased sediment. (R.R. at 1224a, 1227a–28a.) Anthony Wayne Sacco, a member of the Association's board, testified that the Association never gave notice of the Pond's sediment problem to the School District prior to filing a lawsuit against the School District. (R.R. at 1394a.)

The Association presented the expert testimony of Terry Soster (Soster), a registered engineer. Soster testified that he performed an evaluation in 2011 for the Association in order to determine the cause of the Pond's sediment problem. (R.R. at 1420a–21a.) He opined that the School District was a major contributor to the Pond's problem but that the Township was also a contributor. (R.R. at 1458a.) He explained that the water runoff from the School District's sports complex drains onto McDowell Lane, and eventually ends in the Pond. (R.R. at 1471a.) He stated that neither the School District nor the Township provided him with a stormwater management plan upon his request. (R.R. at 1466a–67a.) While he did not prepare his own stormwater management plan or calculate the amount of runoff both pre- and post-construction, Soster testified that "it's common sense that when you take

grass away and you put in asphalt, the runoff is more" and that when you put pipes in the ground to carry water or build structures with roofs, the water "comes off faster." (R.R. at 1493a–94a.) He also opined that the sediment accumulation rate in the Pond after construction of the School District's sports complex was higher than it was pre-construction. (R.R. at 1510a–11a.)

Dan Deiseroth (Deiseroth), who was the Township engineer during the construction of the sports complex in 1997–98 and the vice president of Gateway Engineers, which was the engineering firm hired for the sports complex project, testified that there was a stormwater management plan in place during construction. (R.R. at 1229a–30a.) Deiseroth stated that the School District was never notified by the Association that the Pond was being affected. (R.R. at 1742a.) He also stated that the construction of the sports complex was completed properly and never rushed. (R.R. at 1742a.) Deiseroth said that he could not locate the stormwater management plan because his office had moved. (R.R. at 1748a–49a.) Deiseroth opined that the School District's sports complex is in compliance with the SWMA. (R.R. at 1761a.)

Frank R. Siffrin, the Township's manager, testified that McDowell Lane was repaved in 1997–98 as a result of the lease agreement with the School District and was again improved in 2010 to better manage stormwater. (R.R. at 1781a–83a.) Joseph H. Sites (Sites), the current Township engineer who also works for Gateway Engineers, testified that there was no stormwater consideration for the McDowell Lane improvements in 1997–98 and 2010, because stormwater management does not

granted in part and denied in part the School District's preliminary objections, which led to

the filing of the second amended complaint. (R.R. at 196a–98a.)

apply to resurfacing and other work accomplished on McDowell Lane. (R.R. at 1872a.) Sites stated that the School District never advised Gateway Engineers to cut any corners for the sports complex project. (R.R. at 2042a–43a.)

William L. Schaffer, the School District's former director of support until he retired in 2008, testified that the Association never complained to him that the School District was causing sediment problems in the Pond. (R.R. at 2093a.) He stated that he was involved in the 1997–98 plan to construct the sports complex and that he was not aware of the School District cutting any corners on the project. (R.R. at 2094a–98a.)

The School District presented the expert testimony of Robert Orchowski (Orchowski), who is an environmental consultant, a registered professional engineer, a licensed land surveyor, and a state-certified wastewater treatment plant operator. Orchowski stated that the School District hired him to perform a site investigation of the sports complex, which he did in December 2011 and again in June 2013. (R.R. at 2150a–52a.) He opined that the post-development stormwater discharge rate is less than the pre-development stormwater discharge rate on the sports complex. (R.R. at 2174a.) He also opined that the School District was not negligent because it constructed everything properly and that the School District did not violate any stormwater management requirements. (R.R. at 2191a.)

At the conclusion of the trial on June 20, 2013, the jury returned a verdict in favor of the Association. With respect to the negligence claim, the jury awarded the Association $240,000.00 for present damages and $1,310,000.00 for future damages, for a total of $1,550,000.00. The jury apportioned liability as follows: fifty percent to the Township, forty-five percent to the School District, and five percent contributory negligence on the part of the Association. With respect to the SWMA claim, the jury awarded the Association $319,000.00 for present damages and $1,310,000.00 for future damages, for a total of $1,629,000.00. The jury apportioned liability as sixty percent to the Township and forty percent to the School District. However, the jury noted that $1,550,000.00 of the damages for the violations of the SWMA were also included in the damages awarded under the negligence claim. (R.R. at 752a–57a; 2556a–58a.) Both the Township and the School District filed motions to mold the verdict to $500,000.00, consistent with section 8553 of the PSTCA. The trial court granted these motions and molded the verdict to $500,000.00 for each defendant. (R.R. at 766a–67a.)

The Township and the School District both filed motions for post-trial relief, requesting that the trial court mold the verdict to limit the total amount of the Association's recovery to $500,000.00 and for judgment notwithstanding the verdict and/or a new trial. (R.R. at 759a–64a; 820a–27a.) By orders dated June 26, 2013, and July 2, 2013, respectively, the trial court denied these motions. (R.R. at 768a, 828a.) The Association filed a motion for post-trial relief objecting to the trial court's molding of the verdict to reflect the statutory cap found in the PSTCA and a motion to mold the verdict to add delay damages and post-judgment interest. (R.R. at 769a–80a, 807a–12a.) By order dated September 3, 2013, the trial court granted the Association's motion to mold the verdict to add delay damages and post-trial interest. (R.R. at 942a.) By order dated November 5, 2013, the trial court denied the Association's motion for post-trial relief with respect to the statutory cap, stating that the molded verdict would

remain $500,000.00 against the School District and $500,000.00 against the Township. (R.R. at 943a.) The trial court entered judgment against the Township and the School District on December 18, 2013. (R.R. at 944a–45a.) Each of the parties thereafter filed a notice of appeal with the trial court.

## Trial Court Opinion

In its 1925(a) opinion, the trial court stated that the Association erroneously cited *Deibert v. Pennsylvania Turnpike Commission*, 15 Pa. D. & C. 5th 159 (2010), for the proposition that the PSTCA's statutory cap is inapplicable for claims under the SWMA, and, thus, concluded that the Association's argument was without merit. It found that the constitutionality of the PSTCA has been upheld and that the Association failed to cite any authority for its assertion that the SWMA requires special treatment under the PSTCA or that the statutory cap is against public policy when applied to the SWMA. The trial court noted that the Legislature deliberately chose to provide the $500,000.00 cap on damages. It further concluded that it cannot award equitable relief to the Association after the jury verdict, because the Association never asserted a claim for such relief against the School District or the Township.[5]

The trial court found that *Mench v. Lower Saucon Township*, 159 Pa.Cmwlth. 116, 632 A.2d 1011 (1993), cited by the School District for the proposition that there should be a $500,000.00 cap in the aggregate, was inapplicable because the issue in that case involved whether the cap could be exceeded where the municipality maintained a liability insurance policy in excess thereof. In interpreting section 8553 of the PSTCA, the trial court determined that it was the intent of the Legislature to treat each local agency as any other tortfeasor, but subject to the $500,000.00 cap. The trial court stated that if the $500,000.00 cap was in the aggregate, local agencies would be afforded even greater protection if there was more than one defendant and plaintiffs would be further disadvantaged. Thus, it found that the statutory cap applies to each local agency.

The trial court further concluded that the record is replete with evidence that the School District did not properly manage the stormwater runoff into the Pond. It also found that the School District is not immune under the SWMA because, contrary to the School District's argument that it cannot be liable for negligent supervision of third-party contractors, the Association claimed that the School District was itself negligent. The trial court determined that there was evidence to support the jury's verdict that the School District was negligent. It also found that, based on the discovery rule, this action was filed within the two-year statute of limitations. The trial court noted that the School District failed to cite any authority for its argument that the Association could not file separate counts for negligence and violations of the SWMA against the School District, and, thus, the School District's assertion was without merit.

The trial court stated that the Township's preliminary objections and its motion in limine to exclude the expert testimony of Soster were properly denied. The trial court incorporated the reasoning found in its May 3, 2011 order denying

---

5. In its statement of errors complained of on appeal, the Association argued that the trial court erred in failing to mandate the Township and the School District to implement a stormwater management plan for McDowell Lane and the sports complex to abate the issues caused by stormwater runoff.

the Township's preliminary objections. The trial court explained that Soster's testimony was probative and that it met the Association's burden of proving that the Township and the School District did not adequately manage the stormwater runoff. It stated that the Township's argument that it was not liable for any damages with respect to the sports complex was irrelevant, because the Township's liability derived from the improvements made to McDowell Lane.

The trial court further stated that the Township has no basis for its argument that the jury's verdict is improper because a juror's post-trial statement reveals that the verdict was reached contrary to the trial court's specific instructions. Citing *Carter by Carter v. U.S. Steel Corporation*, 529 Pa. 409, 604 A.2d 1010, 1013 (1992), it stated that jurors may not testify regarding the deliberations, and, thus, "it would be improper for [the trial court] to investigate into the deliberations of a jury." (Trial court op. at 11.) Lastly, the trial court stated that the Township's arguments that the trial court erred on the grounds of insufficient evidence to support the verdict, inconsistent verdict, immunity under the SWMA, a flawed verdict slip, no private right of action under the SWMA, and failure to properly mold the verdict were already raised by the School District and disposed of earlier in its opinion. Thus, the trial court upheld the jury's verdict.

Both the Township and the School District raise six issues on appeal. Several of these issues are common to both appeals and will be addressed initially below. The remaining issues, as well as the three issues raised by the Association in its cross-appeal, will be addressed in separate sections below.

## Discussion

### Issues Common to the Appeals of the Township and the School District Statute of Limitations

▮ The Township and the School District first argue that the trial court erred in failing to dismiss the Association's action as outside the applicable statute of limitations, namely section 5524 of the Judicial Code, 42 Pa.C.S. § 5524. The Township and the School District also argue that the Association failed to provide the requisite notice under section 5522 of the Judicial Code, 42 Pa.C.S. § 5522. We disagree.

Section 5522 of the Judicial Code provides that:

(a) *Notice prerequisite to action against government unit.*

(1) **Within six months from the date that any injury was sustained or any cause of action accrued,** any person who is about to commence any civil action or proceeding within this Commonwealth or elsewhere against a government unit for damages on account of any injury to his person or property under Chapter 85 (relating to matters affecting government units) or otherwise shall file in the office of the government unit, and if the action is against a Commonwealth agency for damages, then also file in the office of the Attorney General, a statement in writing, signed by or in his behalf, setting forth:

(i) The name and residence address of the person to whom the cause of action has accrued.

(ii) The name and residence address of the person injured.

(iii) The date and hour of the accident.

(iv) The approximate location where the accident occurred.

(v) The name and residence or office address of any attending physician.

42 Pa.C.S. § 5522(a)(1)(i)-(v) (emphasis added).

Section 5524 of the Judicial Code provides, in relevant part, that:

The following actions and proceedings must be commenced **within two years:**

. . .

(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.

42 Pa.C.S. § 5524(7) (emphasis added). Therefore, in cases of injury to persons or property by a government unit, the injured party must provide notice of his intent to commence a civil action within six months from the date the injury was sustained or the cause of action accrued, and the civil action must be commenced within two years of the same. Here, the Association only became aware of the cause of the sediment problems in 2010, at which time it immediately notified the Township because it was unaware of the School District's involvement in the matter, and commenced suit within the two-year statute of limitations in June 2011.

The discovery rule tolls the statute of limitations until such time as the tort and the existence of the tortfeasor should have reasonably been discovered. *Fine v. Checcio,* 582 Pa. 253, 870 A.2d 850 (2005). "[T]he salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." *Id.* at 858. Further, "[w]hile reasonable diligence is an objective test, it is sufficiently flexible ... to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question. Under this test, a party's actions are evaluated to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." *Id.* (citation omitted).

The School District and the Township note that the Association was aware of problems with the Pond as early as 1997 and had work performed on the Pond, including dredging to remove excess sediment, in 2001 and 2002, but it did not initiate suit until 2010. Additionally, the School District alleges that it never received the notice required by section 5522(a).

However, John Ackerman, a resident of the Glencannon residential development, and a former member of the Association's board of directors, testified that the Association formed a pond committee in 2009, upon which he served, after residents noticed that the Pond became muddy after a rainfall. (R.R. at 1185a.) Ackerman stated that upon investigation as to the source of this problem, he observed "massive amounts of water coming from the headwalls" of the sports complex, as well as water coming off McDowell Lane and water shooting from a pipe under McDowell Lane. (R.R. at 1171a.) In late 2009, the Association hired Soster to determine the source of the Pond problems, and he determined that the sediment was emanating from outside the Association's property. (R.R. at 1181a, 1183a.)

Ackerman thereafter notified the Township in April of 2010 of the Association's belief that its Pond problems were emanat-

ing from McDowell Lane and the sports complex, but the Township refused to take any action. (R.R. at 1179a–82a.) Ackerman stated that he did not contact the School District regarding the Pond problems because he was not aware until the lawsuit was filed that the School District was responsible for the development of the sports complex. (R.R. at 1199a.) Because the record reveals that the Association only became aware of the cause of the sediment problems in 2010, that it immediately notified the Township of its belief that the problems were emanating from Township property, and that it was unaware of the School District's involvement in this matter until the lawsuit was commenced, we cannot conclude that the trial court erred in failing to dismiss the Association's action as outside the applicable statute of limitations or in failing to conclude that the Association did not provide the requisite notice under section 5522.

### Statutory Cap under Section 8553 of the PSTCA

◼ Next, the Township and the School District argue that the trial court erred in failing to mold the verdict to an aggregate amount of $500,000.00 in accordance with section 8553 of the PSTCA. We disagree.

The question of whether the statutory cap applies individually in situations involving multiple local agency defendants appears to be an issue of first impression in this Commonwealth. As noted above, section 8553(b) of the PSTCA limits the amount of damages recoverable from a local agency, stating that "[d]amages arising from the same cause of action or transaction or occurrence or series of causes of action or transactions or occurrences shall not exceed $500,000 in the aggregate." 42

Pa.C.S. § 8553(b). The Township and the School District argue that the trial court erred by applying this $500,000.00 limitation to each party individually. Both the Township and the School District rely on this Court's decision in *Mench v. Lower Saucon Township*, 159 Pa.Cmwlth. 116, 632 A.2d 1011 (1993), *appeal denied*, 538 Pa. 617, 645 A.2d 1320 (1994), in support of their assertion that an aggregate cap of $500,000.00 applies regardless of the number of local agency defendants. However, this reliance is misplaced.

In *Mench*, a police officer for the borough of Hellertown was traveling at a high rate of speed in response to an emergency call in Lower Saucon Township when he lost control of his police cruiser, crossed the center line, and struck an oncoming vehicle head-on, which resulted in the death of the driver of that vehicle. The driver's estate filed a claim for wrongful death and survival damages against the officer, the borough of Hellertown, and the township, the latter's liability predicated on the theory that the borough police officer was acting as a "borrowed servant" for the township.[6] A jury found in favor of the estate and awarded damages in excess of $730,000.00. The borough and the township thereafter filed a motion to mold the verdict to $500,000.00 under section 8553. The estate opposed the motion, arguing that both the borough and the township had purchased automobile insurance policies for $1,000,000.00, thereby subjecting each to liability above and beyond the cap. Nevertheless, the common pleas court granted the motion of the borough and the township.

On appeal to this Court, the estate alleged that the common pleas court erred in molding the verdict in light of the automo-

---

6. The common pleas court held a non-jury trial with respect to the issue of liability and rendered a verdict imposing vicarious liability on both the borough and the township for damages resulting from the negligence of the police officer.

bile insurance policies purchased by the borough and the township. More specifically, relying on section 8558 of the PSTCA,[7] the estate alleged that the purchase of this excess insurance resulted in a waiver of the statutory cap under section 8553(b). We rejected the estate's allegations, noting that section 8553(b) clearly sets forth a limitation on damages of $500,000.00 in the aggregate. With regard to section 8553(b), we stated that "the clear intent of the General Assembly was that municipalities were to be placed upon the same footing as other persons with regard to liability resulting from certain acts up to a maximum liability of $500,000.00 per incident or series of incidents." *Id.* at 1013 (citation omitted).

However, there was never any discussion in *Mench* as to whether the $500,000.00 cap could be applied individually to the borough and the township. Rather, our decision in *Mench* solely involved a determination of whether the purchase of $1,000,000.00 automobile insurance policies by the borough and the township resulted in a waiver of the statutory cap. Moreover, the liability in *Mench*, which was imposed vicariously on both the borough and the township, resulted from a single incident, the automobile accident involving a borough employee.

In this case, we have two separate claims, negligence and violation of the SWMA, against two separate local agencies, the Township and the School District. The liabilities of the Township and the School District are not predicated on a master-servant or borrowed-servant relationship, nor are such liabilities imposed under a theory of vicarious liability. Rath-

er, the Association alleged that each defendant was separately negligent and separately violated the SWMA through its own distinct actions, and the jury found as such, apportioning liability and awarding damages against each. Indeed, section 8542(a) of the PSTCA provides that *"[a] local agency* shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter...." 42 Pa.C.S. § 8542(a). This section further limits the imposition of liability to situations where "[t]he injury was caused by the negligent acts of *the local agency*...." Section 8542(a)(2) of the PSTCA, 42 Pa.C.S. § 8542(a)(2).

Additionally, as noted above, we have described the intent of the General Assembly with respect to section 8553 of the PSTCA as placing municipal entities "upon the same footing as other persons with regard to liability resulting from certain acts." *Mench*, 632 A.2d at 1013. In other words, the General Assembly intended that municipal entities subject to liability under an exception to the PSTCA be treated like any other tortfeasor, the only exception being the $500,000.00 cap on damages. As the trial court noted, the Township and the School District's reading of section 8553 "would confer even greater advantages to local agency defendants in multiple defendant cases, as each additional defendant would lessen the liability to which the others would be subject (*i.e.*, the fixed $500,000 'pie' would be split more ways)." (Trial court op. at 6.) Applying such reasoning here, the damages payable by the Township and the School District would fall below the statutory cap. At the same time, a plaintiff such as the Associa-

---

7. Section 8558 states that:
 If the judgment is obtained against a local agency that has procured a contract or policy of public liability insurance protection, the holder of the judgment may use the methods of collecting the judgment as are provided by the policy or contract and the laws of the Commonwealth to the extent of the limits of coverage provided.
 42 Pa.C.S. § 8558.

tion, already disadvantaged by the imposition of the statutory cap, "would be further disadvantaged because it was harmed by two local agencies instead of one." (Trial court op. at 7.) We agree with this reasoning by the trial court and, thus, cannot conclude that it erred in molding the verdict to $500,000.00 against each defendant.

## Verdict Slip

■ The Township and the School District also argue that the trial court erred in submitting the case to the jury with a flawed verdict slip which invited the entry of a verdict awarding duplicative and repetitive damages under two overlapping theories of liability. More specifically, the Township and the School District argue that the Association's SWMA claim was nothing more than a repackaging of its negligence claim. We disagree.

The SWMA was designed to "[e]ncourage planning and management of storm water runoff in each watershed which is consistent with sound water and land use practices." Section 3(1) of the SWMA, 32 P.S. § 680.3(1). Section 13 of the SWMA imposes specific duties on persons who engage in the alteration or development of land, thereby affecting stormwater runoff, in order to "prevent injury to health, safety or other property." 32 P.S. § 680.13. Section 15(c) creates a statutory cause of action for violations of section 13, providing that "[a]ny person injured by conduct which violates the provisions of section 13 may, in addition to any other remedy provided under this act, recover damages caused by such violation from the landowner or other responsible person." 32 P.S. § 680.15(c). This cause of action is separate and distinct from the Association's negligence claim.

Indeed, the jury herein was free to decide whether the Township or the School District was liable under the SWMA for not taking appropriate measures to prevent injury to another person or property, such as implementing a stormwater management plan, and also negligent by installing curbs, with various curb cuts, along McDowell Lane. Moreover, the damages awarded by the jury in this case were not duplicative or repetitive since they were not added together. To the contrary, the verdict slip included a specific question as to whether any of the damages for violations of the SWMA were also included in the damages awarded under the negligence claim. Thus, we cannot conclude that the verdict slip submitted to the jury was flawed.

## Remaining Issues in Township's Appeal

### Utility Service Facilities Exception to Immunity

■ The Township argues that the trial court erred in failing to grant a directed verdict, set aside the verdict, award a new trial, or enter judgment in its favor as the verdict rendered was contrary to the immunity granted to it under the PSTCA. We disagree.

The PSTCA generally shields local agencies from tort liability for injuries caused by the agency or its employees. Section 8541 states as follows:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

42 Pa.C.S. § 8541. However, the legislature has provided limited exceptions to this grant of immunity. Section 8542(a) of the Tort Claims Act states that a local agency shall be liable for damages if: (1) the damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a

person not having available an immunity defense; (2) the injury was caused by the negligent acts of the local agency or its employee; and (3) the negligent acts fall within one of the enumerated exceptions to governmental immunity listed in section 8542(b). 42 Pa.C.S. § 8542(a).

The Association argues that the Township fell within the utility service facilities' exception found at section 8542(b)(7) of the PSTCA. This section states that:

> (b) Acts which may impose liability.— The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:
>
> . . .
>
> ▉ (7) Utility service facilities.—A dangerous condition of the facilities of steam, sewer, water, gas or electric systems owned by the local agency and located within rights-of-way, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

42 Pa.C.S. § 8542(b)(7). This Court has previously held that stormwater management which involves culverts, basins, swales, and/or drains is the equivalent of a sewer for purposes of this exception. *See, e.g., DeTurk v. South Lebanon Township,* 116 Pa.Cmwlth. 557, 542 A.2d 213 (1988) (township liable under utility service facilities' exception for injuries sustained as a result of negligent construction of a swale); *Medicus v. Upper Merion Township,* 82 Pa.Cmwlth. 303, 475 A.2d 918 (1984) (township could be liable under utility service facilities' exception for injuries sustained as a result of negligence maintenance of culverts). Moreover, under common law, a municipal entity is liable for injuries resulting from negligent construction of a sewer system or for failure to keep the system in repair, but not for claims relating to the inadequacy of the system. *McCarthy v. City of Bethlehem,* 962 A.2d 1276 (Pa.Cmwlth.2008), *appeal denied,* 603 Pa. 706, 983 A.2d 1250 (2009).

In the present case, the trial court and jury heard evidence regarding the Township's improvements to McDowell Lane in 2010, including paving and the addition of curbing with "V cuts," as well as the existence of a culvert/drain pipe under the roadway, all of which contributed to an increase in the velocity and quantity of water and sediment which would deposit into a tributary on the Association's property and eventually into the Pond. (R.R. at 1470a–71a, 1495a, 1500a, 1592a, 1945a, 2011a, 2152a.) This was especially important in light of the School District's development of the sports complex, which included catch basins and at least three drainage pipes that collected and deposited stormwater onto McDowell Lane. (R.R. at 1472a–73a, 1583a.) Certainly, based upon this testimony, the jury could find that the Township's improvements to McDowell Lane resulted in a dangerous condition, that said condition created a reasonably foreseeable risk of the kind of injury suffered by the Association, and that the Township could be reasonably charged with notice under these circumstances. Thus, the trial court did not err in failing to conclude that the Association's claims were barred by the immunity granted to the Township under the PSTCA.

## Vicarious Liability

Next, the Township argues that the trial court erred in failing to grant a directed verdict, set aside the verdict, award a new trial, or enter judgment in its favor as the

verdict rendered was contrary to the evidence that any acts or omissions with respect to the development of the sports complex were those of a third party over whom the Township was not vicariously liable. We disagree.

Contrary to the Township's assertions, the Association is not alleging that the Township was negligent for the conduct of a third party. Rather, the Association alleged in its second amended complaint that the Township "negligently maintained the storm water management system for McDowell [Lane]" and "failed to use due care" so as not to subject its property to damages. (R.R. at 213a.) As noted above, the Association provided extensive testimony and evidence before the trial court in support of these allegations. Thus, the trial court did not err in failing to grant a directed verdict, set aside the verdict, award a new trial, or enter judgment in its favor on the basis that the verdict rendered was contrary to the evidence.

### Motion in Limine

■■■ Finally, the Township argues that the trial court erred in denying its motion in limine with respect to the testimony of Soster, and in refusing to strike said testimony, in light of Soster's failure to meet the foundational threshold for admissibility, i.e., his testimony failed to establish that the Township's actions increased the rate or volume of flow of stormwater over and above pre-existing levels. We disagree.

The Township points to section 13 of the SWMA, which addresses the duties of persons engaged in the development of land, and provides that:

Any landowner and any person engaged in the alteration or development of land which may affect storm water runoff characteristics shall implement such measures consistent with the provisions of the applicable watershed storm water plan as are reasonably necessary to prevent injury to health, safety or other property. Such measures shall include such actions as are required:

(1) to assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or

(2) to manage the quantity, velocity and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from possible injury.

32 P.S. § 680.13. The Township notes that the same is true under common law. *See Miller v. Laubach*, 47 Pa. 154 (1864) (owner of land who constructed drain that deposited increased water flow on neighbor's land was properly held liable for damage to that land that resulted therefrom); *Meixell v. Morgan*, 149 Pa. 415, 24 A. 216 (1892) (landowner was permitted to install drains and discharge water into its natural channel, even onto the land of another, but the water must not be diverted from its natural channel by the opening of new or different channels).

The Township asserts that because Soster made no calculations regarding the rate and flow of water both pre- and post-development, even though he testified such calculations were possible, his testimony lacked foundation and amounted to nothing more than conjecture. However, section 13 of the SWMA requires a developing landowner to take such measures to assure that the rate of stormwater is not greater after development *or* to manage this stormwater runoff in such a manner that protects health and property from possible injury. Soster's testimony focused on the latter measure. For example, Soster testified that the alterations to McDowell Lane increased the impervious coverage and created three discharge

points that did not previously exist, thereby changing the runoff characteristics of that road. (R.R. at 1583a.)

■■■■■ Moreover, the admission of testimony from an expert witness is within the sound discretion of the trial court, *Peden v. Gambone Brothers Development Company,* 798 A.2d 305 (Pa.Cmwlth.2002), and expert opinion testimony is proper if the facts upon which it is based are of record. *Commonwealth v. Rounds,* 518 Pa. 204, 542 A.2d 997 (1988). "Speculative testimony or testimony made without reasonable certainty does not aid the trier of fact and should be stricken." *Duquesne Light Company v. Woodland Hills School District,* 700 A.2d 1038, 1047 (Pa.Cmwlth. 1997), *appeal denied,* 555 Pa. 722, 724 A.2d 936 (1998). However, "[a]n opinion of an expert based upon an adequate factual foundation is neither speculative nor conjecture, but a legitimate inference and as such has evidentiary value in determining disputed questions of fact." *Albig v. Municipal Authority of Westmoreland County,* 348 Pa.Super. 505, 502 A.2d 658, 667 (1985) (citations omitted).

Soster's testimony was based upon his 36 years of experience as an engineer with a specialty in water resources engineering. (R.R. at 1420a.) In the course of his investigation for the Association, Soster reviewed the Township's stormwater management ordinance, documents relating to the history of the Pond, and documents relating to the development of the sports complex, and he also conducted a site inspection. (R.R. at 1429a–30a, 1445a.) Hence, Soster's testimony was based upon an adequate factual foundation, i.e., facts of record, and was neither speculative nor conjecture. Thus, the trial court did not err in denying the Township's motion in limine and in refusing to strike Soster's testimony.

## Remaining Issues in School District's Appeal
### SWMA

The School District argues that the trial court erred in failing to set aside the verdict and strike the judgment based upon violations of the SWMA. More specifically, the School District argues that the Association's failure to present any evidence before the trial court regarding the rate of water flow both pre- and post-development of the sports complex and McDowell Lane precludes a finding that it violated the SWMA. However, this identical issue was raised by the Township in the immediately preceding argument and we reject this argument for the reasons stated above.

### Real Property Exception to Immunity

■■■■ The School District's final two arguments are premised on its claim that the trial court erred in failing to conclude that the Association's negligence claims and judgment entered against it on these claims were barred by the immunity provided by the PSTCA. We disagree.

School districts are considered "local agencies" for purposes of the PSTCA. *Taylor v. Northeast Bradford School District,* 101 A.3d 144 (Pa.Cmwlth.2014). Hence, the School District is subject to the same immunity as the Township discussed above under section 8541 of the PSTCA, as well as the limited exceptions to immunity under section 8542. The School District argues that the Association's claims do not fit within any of the exceptions to immunity. In this regard, the School District first notes that it did not develop or construct the sports complex, that the work was performed by independent third parties, and that it did not act negligently to form the basis for any claims. Second, the School District notes that it did not own, possess, or have total control over the sports complex. The Association responds

by asserting that the School District is subject to liability under the real property exception found at section 8542(b)(3) of the PSTCA.

This section states that:

(b) Acts which may impose liability.—The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

. . .

(3) Real property.—The care, custody or control of real property in the possession of the local agency, except that the local agency shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the local agency. As used in this paragraph, 'real property' shall not include:

(i) trees, traffic signs, lights and other traffic controls, street lights and street lighting systems;

(ii) facilities of steam, sewer, water, gas and electric systems owned by the local agency and located within rights-of-way;

(iii) streets; or

(iv) sidewalks.

42 Pa.C.S. § 8542(b)(3).

Contrary to the School District's arguments, the Association is not alleging that the School District was negligent for the conduct of any third-party contractors. Rather, the Association alleged in its second amended complaint that the School District "negligently maintained the storm water management system" for the sports complex and "failed to use due care" so as not to subject its property to damages. (R.R. at 217a.) This Court has previously upheld application of the real property exception in similar circumstances. *Staffaroni v. City of Scranton*, 153 Pa.Cmwlth. 188, 620 A.2d 676 (1993). In *Staffaroni*, Al Staffaroni filed a complaint in equity against the City of Scranton alleging that the City negligently constructed its stormwater management system by installing a drainage pipe underneath a road abutting his property which collected and discharged surface water in such a concentrated fashion onto his property that it caused a gully and erosion. The City alleged that it was immune from suit under the PSTCA.

The common pleas court rejected the City's allegation on the basis of the real property exception and issued an order directing the City to block off the pipe and compensate Staffaroni for the damage to his property. On appeal, this Court affirmed. We explained that the real property exception provides a remedy "for injuries caused by artificial conditions or defects of the land itself." *Id.* at 679. We held that the drainage pipe constituted an artificial condition of the City's real property, thereby placing Staffaroni's claim within the exception of section 8542(b)(3) and precluding the City from asserting immunity.

Similarly, in this case, during the construction of the sports complex, the School District approved the placement of three headwalls and numerous pipes to collect and drain stormwater from the complex onto McDowell Lane, without implementing a stormwater management plan. This stormwater ultimately traversed both under and over McDowell Lane and into a tributary that ends at the Pond on the Association's property. (R.R. at 1171a, 1398a, 1472a, 1502a, 1681a, 1804a–05a, 2010a.)

Moreover, this Court has previously held that ownership of real property is not required for possession to be found under section 8542(b)(3) of the PSTCA. *Sweeney v. Merrymead Farm, Inc.*, 799 A.2d 972 (Pa.Cmwlth.2002). Rather, we

stated in *Sweeney* that "possession under the real property exception means total control over the premises by the local agency; limited control or mere occupation for a limited period of time is insufficient to impose liability." *Id.* at 977. The Association does not dispute that the Township, not the School District, is the owner of the sports complex property. However, the Township and the School District entered into a 99–year lease for this property in 1997. Pursuant to the terms of this lease, the School District was solely responsible for the development of the sports complex, including any and all:

A. Site development;

B. Bulk excavation;

C. Clearing and grubbing;

D. Grading;

E. Topsoil;

F. Seeding;

G. Shredding and placement;

H. All storm water management;

I. Storm sewer and drainage related improvements;

J. Installation of entrance driveway;

K. Development of all parking areas; and

L. Access road to equipment storage building.

(R.R. at 120a.)

Additionally, the School District was solely responsible for all costs relating to "the construction and installation of all physical buildings, storage facilities, concession stands, rest room facilities ... locker rooms ... all irrigation sprinkler systems, electrical lighting, and water and sewer service improvements on-site...." [8] *Id.* at 120a–21a. The School District was required to provide "[a]ll site plans, engi-

neering plans, development plans, contract documents, bid specifications and other matters relating to appropriate planning and development of the site...." *Id.* at 121a. The lease agreement also holds the School District responsible for "all necessary maintenance" at the site and the purchase of equipment for this purpose. (R.R. at 122a–23a.) Perhaps most importantly, the lease agreement provides that the School District "shall have the exclusive right to use the PROPERTY, site, buildings and facilities and to permit and schedule usage by organizations and/or persons and/or other entities." (R.R. at 124a.)

A review of these lease provisions reveals that the School District essentially has total control of the sports complex such that it could be found in possession of the same under the real property exception to immunity. Thus, the trial court did not err in failing to conclude that the Association's negligence claims and judgment entered against it on these claims were barred by the immunity provided by the PSTCA.

### The Association's Appeal

### Statutory Cap and SWMA

▉ In its cross-appeal, the Association first argues that the trial court erred by molding the verdict to $1,000,000.00 and by ruling that the statutory cap under the PSTCA applied to claims under the SWMA. The Association argues that its SWMA claims constituted separate statutory causes of actions not subject to the cap. We disagree.

In support of its argument, the Association relies on a decision from the Lehigh County Court of Common Pleas, *Deibert v.*

---

8. The Township remained responsible for ensuring that water and a sanitary sewer line would be available to the site. (R.R. at 121a.)

*Pennsylvania Turnpike Commission,* 15 Pa. D. & C. 5th 159 (2010). However, the Association's reliance on *Deibert* is misplaced as this Court is not bound by the common pleas court's decision and, further, it is distinguishable.[9] In *Deibert,* the plaintiffs, two sets of landowners, filed suit against numerous defendants, including the Pennsylvania Turnpike Commission, several residential development companies, and Lower Macungie Township (LMT), alleging that the defendants permitted excessive amounts of stormwater to channel onto their land, thereby causing sinkholes and rendering the land unsafe during significant rainfall. The plaintiffs alleged that the developer defendants were negligent with regard to the design and construction of stormwater management facilities on their respective developments and that the facilities violated the SWMA. Plaintiffs also alleged that LMT violated the SWMA by approving stormwater management plans that did not comply with the SWMA or the local subdivision and land development ordinance, and by failing to require developers to install adequate surface water management facilities.

The common pleas court ultimately held that LMT was subject to liability under the SWMA, finding as fact that the SWMA "creates a statutory cause of action" and that "[t]he Sovereign Immunity Act creates an exception to sovereign immunity where damages are recoverable in a statute creating a cause of action." *Id.* at 174. The common pleas court noted that the SWMA provides for remedies in the nature of both equitable relief and damages. However, nowhere in its decision does the common pleas court address the statutory cap under section 8553 of the PSTCA, let

alone conclude that such cap is inapplicable to claims under the SWMA.

Moreover, the SWMA became effective on October 4, 1978. At that time, political subdivisions and Commonwealth agencies did not enjoy immunity. *See Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973) (abolishing the doctrine of governmental immunity in Pennsylvania). Shortly after the enactment of the SWMA, on November 26, 1978, this immunity was reestablished under the PSTCA. The PSTCA contains no special exception for any pre-existing statutory cause of action, such as an action under the SWMA. Instead, section 8542(a)(1) specifically states that a local agency may only be held liable for damages "within the limits set forth in this subchapter...." 42 Pa.C.S. § 8542(a)(1). Hence, the trial court did not err in applying the statutory cap to the Association's claims under the SWMA.

### Equitable Relief

Next, the Association argues that the trial court erred by failing to grant it equitable relief and mandate that the Township and the School District comply with the SWMA and implement a stormwater management plan for both McDowell Lane and the sports complex that will abate the issues caused by stormwater runoff. The Township and the School District contend that the Association has waived this issue by failing to raise it before the trial court. We agree with the Township and the School District.

The law is well settled that issues not raised in the lower court are waived and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a); *Estate of Marra v. Tax Claim Bureau of Lackawanna*

---

**9.** Decisions of common pleas courts are not binding precedent on appellate courts, but may be considered for their persuasive authority. *Bucks County Services, Inc. v. Philadelphia Parking Authority,* 71 A.3d 379 (Pa. Cmwlth.2013).

*County,* 95 A.3d 951 (Pa.Cmwlth.2014). Additionally, our Supreme Court has held that an appellate court cannot reverse a trial court judgment on a basis that was not properly raised and preserved by the parties. *Steiner v. Markel,* 600 Pa. 515, 968 A.2d 1253 (2009).

The record reveals that the Association, in its second amended complaint, did not specifically request equitable relief against either the Township or the School District. The Association did, however, request such relief against the other defendants in this case, McDowell Estates and Heartland Homes. In addition, when the Association sought to include a claim for injunctive relief in its proposed jury instructions, counsel for the School District objected to the same, noting that the second amended complaint did not include any allegation or count against the School District or the Township for injunctive relief. (R.R. at 2315a.) Counsel for the Association thereafter agreed that the Association was not seeking an injunction and that part of the proposed jury instructions could be stricken. (R.R. at 2316a.) Because the Association did not raise or properly preserve this issue before the trial court, we must conclude that it is waived.

### Constitutionality of the Statutory Cap

█ Finally, the Association argues that the statutory damages cap under section 8553 of the PSTCA was unconstitutional, irrational, and unreasonable. The Association argues that the statutory cap violates the United States and Pennsylvania Constitutions, in that it results in a taking without just compensation. The Association also argues that the statutory cap violates the right to a jury trial guaranteed by Article I, section 6 of the Pennsylvania Constitution. Article I, section 6 of the Pennsylvania Constitution states that:

Trial by jury shall be as heretofore, and the right thereof remain inviolate. The General Assembly may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case. Furthermore, in criminal cases the Commonwealth shall have the same right to trial by jury as does the accused.

PA. CONST. art. I, § 6. The Association asserts that by capping the jury's award, the statute deprives plaintiffs of the compensation that the jury determined was warranted by the evidence. However, this identical argument was recently considered and rejected by our Supreme Court in *Zauflik v. Pennsbury School District,* —— Pa. ——, 104 A.3d 1096 (2014).

In *Zauflik,* Ashley Zauflik, a 17–year old high school student, was one of a group of students struck by an out of control school bus owned and operated by the Pennsbury School District. Zauflik sustained severe crush injuries to her left leg and pelvis, which ultimately resulted in an above-the-knee amputation of this leg. Pennsbury School District admitted liability for Zauflik's injuries and a jury trial was held solely for a determination of damages. A jury returned a verdict in excess of $14 million. Upon motion of the Pennsbury School District, the verdict was molded to $500,000.00 in accordance with section 8553 of the PSTCA. Zauflik appealed, alleging, *inter alia,* that application of the statutory damages cap to reduce the jury's verdict violated her constitutional right to a jury trial under Article I, section 6. In this regard, Zauflik alleged that the cap was so onerous and restrictive that it essentially made the right to a jury trial unavailable to her.

However, the court disagreed, describing Zauflik's allegations as "obviously misdirected." *Id.* at 1131. The court explained that the damages cap did not

"present a condition or restriction on [Zauflik's] right to have a jury hear her case; rather, the burden lies in the limited amount of recovery allowed, and that is obviously not the same thing." *Id.* at 1132. The court noted that successful plaintiffs are often limited in their ability to recover the full amount of a jury's award for many different reasons. Ultimately, the court held as follows:

> Even if it is assumed that the right to a jury trial in negligence cases filed against governmental entities existed in the 'heretofore' described in Article I, Section 6, such that it must 'remain inviolate' now, the full-blown jury trial appellant demanded and received was not impeded by the damages cap. What was affected was the ultimate recovery post-verdict, which was not a function of the trial here being by jury. As stated, that effect of the cap exists in all such cases—whether resolved by judgment motion, jury trial, bench trial, or negotiated settlement—but the cap did not alter the availability, or contours of, a jury trial, any more than a jury trial against a judgment-proof defendant could be said to impair the jury trial right. Appellant has not met her burden of establishing that the Act's damages cap clearly, palpably and plainly violates Article I, Section 6.

*Id.* at 1133. Based upon this reasoning, we must likewise reject the Association's claim that the statutory cap violates Article I, section 6.

 With regard to the alleged unlawful taking, the Fifth Amendment to the United States Constitution states, in relevant part, "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. Article I, section 10 of the Pennsylvania Constitution similarly states "nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." PA. CONST. art. I, § 10. The Association argues that the statutory cap results in a de facto taking without just compensation. More specifically, the Association argues that an unlawful taking occurred when the trial court molded the verdict from $1,629,000.00 to $1,000,000.00, thereby precluding it from being justly compensated for the de facto taking of its Pond. The Association correctly notes that a de facto taking occurs when a governmental entity "substantially deprives an owner of the beneficial use and enjoyment of his property." *Department of Transportation v. Securda & Company, Inc.*, 16 Pa.Cmwlth. 40, 329 A.2d 296, 297 (1974) (citation omitted).

However, we question whether a de facto taking ever occurred in this case. The only harm alleged by the Association in this case is an increase in the amount of sediment in the Pond. Even with the molded verdict, the Association has the resources to remedy this harm. Moreover, our Supreme Court has held that "it is within the province of the Legislature to determine that certain bars to suit are, in its judgment, needed for the operation of local government." *Carroll v. County of York*, 496 Pa. 363, 437 A.2d 394, 397 (1981). Further, our Supreme Court has held that the Legislature has such complete control that "it could abolish altogether the right to recover against the Commonwealth in tort actions," and that "[i]f the legislature may abolish a cause of action, surely it may also limit the recovery on the actions which are permitted." *Smith v. City of Philadelphia*, 512 Pa. 129, 516 A.2d 306, 309 (1986). Thus, we cannot conclude that the statutory cap on damages results in an unlawful taking without just compensation.

Accordingly, the order of the trial court is affirmed.

## ORDER

AND NOW, this 22nd day of April, 2015, the order of the Court of Common Pleas of Washington County, dated June 25, 2013, is hereby affirmed.